UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
JAY GLENN,

                              Plaintiff,                          10-cv-8287 (WHP)

            -against-

THOMAS FORTUNE FAY, STEVEN R. PERLES,            SECOND
FAY & PERLES, ALLAN L. ROTHENBERG                AMENDED
And ANTHONY J. LASPADA,                          COMPLAINT

                              Defendants.
-----------------------------------------------------------------------x

       Plaintiff Jay Glenn ("Glenn") commences this civil action against Defendants Thomas

Fortune Fay ("Fay"), Steven R. Perles, Esq., ("Perles"), their law firm Fay & Perles ("F&P"),

Allan L. Rothenberg ("Rothenberg") and Anthony J. LaSpada ("LaSpada") for (1) a declaratory

judgment as to Glenn's share of any damages recovered in actions now pending in the United

States District Court in and for the Southern District of New York which actions seek to enforce

the judgment rendered in *Peterson v. Islamic Republic of Iran,* Case No. 1:2001-cv-02094 in the

United States District Court for the District of Columbia (the "Peterson Liability Action"), and

(2) to enforce his attorney's charging lien against any assets collected in New York by

Defendants.  In support of his action, Plaintiff Glenn alleges as follows:

## PARTIES AND DIVERSITY JURISDICTION

       1.   Glenn is a resident of the State of Illinois, with his residence address at 27148 West

Lakeview Drive South, Lake Barrington, Illinois 60084.

       2.   Glenn is an attorney admitted to practice in the State of Illinois.

       3.   Defendant Fay is a resident of Silver Spring, Maryland, with his residence address

located at 2048 Merrifields Drive, Silver Spring, Maryland 20906.

4. Fay has been Glenn's brother-in-law since 1967.

5. In light of this long family relationship, Glenn trusted Fay implicitly.

6. On information and belief, defendant Perles is a resident of Florida, but maintains his business address at 1146 19th Street, N.W., 5th Floor, Washington, D.C. 20036.

7. On information and belief, Fay and Perles are both attorneys licensed to practice law in the District of Columbia.

8. On information and belief, defendant F&P is a law partnership with its place of business located at 777 6th Street N.W., Suite 410, Washington, D.C. 20001.

9. On information and belief, Fay and Perles are the only partners in F&P.

10. On information and belief, defendant Rothenberg is a resident of the State of Pennsylvania, with offices in Philadelphia, New Jersey and also in the Southern District of New York at 450 Seventh Avenue, New York, New York 10001.

11. On information and belief, Rothenberg is an attorney licensed to practice law in Pennsylvania, New Jersey and New York.

12. On information and belief, LaSpada is a resident of the State of Florida, with an office address at 1802 North Morgan Street, Tampa, FL 33602.

13. On information and belief, LaSpada is an attorney licensed to practice law in the State of Florida.

14. The amount in controversy in this case exceeds Seventy Five Thousand Dollars ($75,000.00).

15. There is complete diversity of citizenship between the parties.

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**IN REM JURISDICTION**

17.  Glenn commenced this action to determine his interest in assets belonging to the Islamic Republic of Iran ("Iran"), which assets are located in the Southern District of New York (the "New York Iranian Assets").

18.  Defendants all have competing claims to these assets.

19.  In 1983 terrorists attacked the United States military barracks in Beirut, Lebanon, killing 241 American servicemen including 220 United States Marines, and causing many other persons to suffer horrific injuries (the "Beirut Bombing").

20.  The terrorists who carried out the attack received training, funding and logistical support from the government of the Islamic Republic of Iran ("Iran").

21.  Survivors and relatives of persons injured and/or killed in the Beirut Bombing commenced numerous legal actions against Iran.

22.  Defendants Fay, Perles and their law firm F&P represented approximately 890 such plaintiffs (the "Peterson Plaintiffs") in the Peterson Liability Action.

23.  Defendants Rothenberg and LaSpada referred clients to F&P for representation in the Peterson Liability Action.  On information and belief, Rothenberg and/or LaSpada have contingency referral agreements for the Peterson Plaintiffs they referred to F&P.

24.  Fay, Perles and F&P retained Glenn to prove damages on behalf of approximately 64 of the plaintiffs in the Peterson Liability Action.

25.  Pursuant to F&P's written agreement with Glenn (the "Work Agreement" Exhibit A), Glenn was to receive "3% of the gross amount collected from the Defendants with respect to compensatory damages as to each client referred to [Glenn] . . .."

26. In addition to the Work Agreement, Fay and F&P agreed to pay Glenn a referral fee equal to one third of F&P's contingency fee for any new plaintiffs that Glenn referred to F&P.

27. The Peterson Litigation resulted in a $2,656,944,877.00 judgment in favor of the plaintiffs (the "Peterson Plaintiffs") and against Iran, which judgment included damages for the Peterson plaintiffs represented by Glenn in the amount of $309,741,881.00.

28. On information and belief, Defendants have located assets belonging to Iran in New York (i.e., the "New York Iranian Assets"), including but not limited to (1) accounts or other assets held in New York by Citibank N.A.; ("Citibank"); (2) accounts or other assets held in New York by Clearstream Bank S.A. ("Clearstream"); and (3) a building located at 650 Fifth Avenue, New York, New York.

29. On information and belief, Defendants Fay, Perles and F&P hired New York lawyers to institute collection proceedings to recover the New York Assets for the Peterson Plaintiffs.

30. On information and belief, Defendants brought these collection actions in the United States District Court for the Southern District of New York because this is the judicial district where the New York Iranian Assets are located, and because this Court has jurisdiction over the New York Iranian Assets.

31. This action concerns Glenn's right to payment from the New York Iranian Assets for his legal services on behalf of the Peterson Plaintiffs.

32. This Court has *in rem* jurisdiction to determine claims to property which is located in New York, including the New York Iranian Assets, even where the competing claimants to such assets would not be otherwise subject to *in personam* jurisdiction in New York.

33.  This Court has *in rem* jurisdiction to determine the amount of Glenn's interest in and charging lien against the New York Iranian Assets.

34.  By virtue of the foregoing, this Court has in rem jurisdiction over this action.

**PERSONAL JURISDICTION**

35.  Rothenberg maintains a law office in the Southern District of New York and practices law in New York.

36.  This Court has personal jurisdiction over Rothenberg.

37.  On information and belief, Defendants Fay, Perles and F&P are each doing business in New York on a regular, continuous and substantial basis.

38.  Fay, Perles and F&P retained New York law firms (the "NY Lawyers") to represent the Peterson Plaintiffs in at least three turnover actions (the "NY Turnover Actions") involving billions of dollars of New York assets in this Court: i.e., *Peterson v. Islamic Republic of Iran*, 08 MIS 302, *Levin v. Islamic Republic of Iran* and *Peterson v. 650 Fifth Avenue Holding Company*, 10-cv-1627.

39.  The NY Turnover Actions are likely to result in hundreds of millions of dollars in New York Assets being paid to Defendants.

40.  On information and belief, the NY Lawyers retained by Defendants have made dozens of court appearances and filed many papers in the United States District Court in and for the Southern District of New York, all in an effort to collect a judgment in the State of New York which will likely enrich Defendants Fay, Perles and F&P by several hundred million dollars.

5

41.  Fay, Perles and F&P are purposefully availing themselves of the benefit of New York laws to collect a judgment against Iran, while simultaneously trying to circumvent Glenn's charging lien against the New York Iranian Assets – the very proceeds they seek to recover.

42.  The Court's personal jurisdiction over Fay, Perles and F&P does not offend due process where these Defendants are continuously and substantially benefitting from the laws of New York and have hired NY Lawyers in an effort to collect billions of dollars in New York Assets for their clients and themselves in the NY Turnover Proceedings.

43.  Pursuant to the foregoing, this Court has personal jurisdiction over Fay, Perles and F&P under New York CPLR § 301.

44.  Moreover, this Court also has personal jurisdiction over Defendants Fay, Perles and F&P under New York's long arm statute, CPLR § 302.

**GLENN'S AGREEMENTS WITH F&P AND FAY**

45.  Starting in or about January 2002, F&P referred approximately 64 Peterson Plaintiffs to Glenn, and asked Glenn to prove damages for these Peterson Plaintiffs.

46.  Pursuant to the Work Agreement, upon collection of the Peterson Liability Action judgment, Glenn would receive 3% of the gross amount recovered by the Peterson Plaintiffs he represented.

47.  On information and belief, many of the plaintiffs that Fay, Perles and F&P referred to Glenn had in turn been referred to F&P by defendants Rothenberg and LaSpada.

48.  After starting work for the 64 plaintiffs originally referred to him by F&P, Glenn realized that there were numerous potential plaintiffs who F&P had failed to contact and failed to include in the Peterson Liability Action.

49.  Starting in or about early 2003 and continuing until in or about March, 2010, Fay and F&P told Glenn that if he referred additional potential plaintiffs for the Peterson Liability Action in exchange for the standard contingency referral fee, equal to one third of F&P's one third contingency fee (the "Legal Referral Fees").

50.  On information and belief, defendants Rothenberg and LaSpada claim part of the Legal Referral Fees due to Glenn, and there is an issue as to who referred which Peterson Plaintiffs to F&P.

51.  Glenn has named Rothenberg and LaSpada as defendants in this action in order to finally determine his interest in the New York assets.

**The Sommerhof Plaintiffs**

52.  On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to F&P the claims of the following persons (collectively referred to as the "Sommerhof Plaintiffs"):

> The Estate of William Scott Sommerhof, a Marine who was killed in the Beirut Bombing
> William's mother Jocelyn J. Sommerhof
> William's father William J. Sommerhof
> William's brother John Sommerhof

53.  In or about 2002, F&P retained Glenn to represent the Sommerhof Plaintiffs.

54.  Between 2002 and in or about July, 2005, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Sommerhof Plaintiffs.

55.  On or about July 26, 2005, the Special Master issued her report and recommendation concerning the damages to be awarded to the Sommerhof Plaintiffs.

56.  Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with his computation of the amount that would be due under the Work Agreement if and when the Peterson Plaintiffs collected on their judgment.

57. F&P never objected to Glenn's work on behalf of the Sommerhof Plaintiffs.

58. F&P never objected to Glenn's computation of the fees that would be due him for the Sommerhof Plaintiffs.

59. The Sommerhof Plaintiffs were awarded the following damages.

| | |
|---|---|
| Estate of William Scott Sommerhof | $1,361,062.00 |
| Father William J. Sommerhof | $5,000,000.00 |
| Mother Jocelyn J. Sommerhof | $5,000,000.00 |
| Brother John Sommerhof | $2,500,000.00 |
| TOTAL: | $13,861,062.00 |

60. If the entire award is collected, Glenn's 3% share of the award to the Sommerhof Plaintiffs would be $415,831.86.

**The Helms Plaintiffs**

61. On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to F&P the claims of the following persons (the "Helms Plaintiffs"):

The Estate of Mark Helms, who was killed in the Beirut Bombing
The Estate of Mark's mother Mary Ann Turek;
Mark's father Marvin Helms
Mark's brother Christopher Helms
Mark's sister Rebecca Gintonio

62. In or about 2002, F&P retained Glenn to prove damages on behalf of the F&G Helms Plaintiffs.

63. Between 2002 and in or about August, 2005, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Helms Plaintiffs.

64. On or about August 10, 2005, the Special Master issued her report and recommendation concerning the damages to be awarded to the Helms Plaintiffs.

65. Immediately after receiving the Special Master's report, Glenn forwarded this report

to F&P, together with a computation of what his 3% fee would be if and when the Peterson

Plaintiffs collected their judgment.

66. F&P never objected to Glenn's work on behalf of the Helms Plaintiffs.

67. F&P never objected to Glenn's computation of the fees that were due him.

68. The Helms Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of Mark A. Helms | $1,028,509.00 |
| Mother Mary Ann Turek | $5,000,000.00 |
| Father Marvin Helms | $5,000,000.00 |
| Brother Christopher Helms | $2,500,000.00 |
| Sister Rebecca Gintonio | $2,500,000.00 |
| TOTAL: | $16,028,509.00 |

69. If the entire award is collected, Glenn's 3% contingency fee of the award due to the

Helms Plaintiffs would be $480,855.27.

**The Livingston Plaintiffs**

70. On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to

F&P the claims of the following persons (the "F&P Livingston Plaintiffs"):

the Estate of Joseph Livingston, who was killed in the Beirut Bombing
Joseph's widow Annette Livingston
Joseph's son Joseph Livingston IV

71. In or about 2002, F&P retained Glenn to prove damages for the F&P Livingston

Plaintiffs.

72. In reliance on Fay's and F&P's promise to pay Legal Referral Fees and their silent

agreement to Glenn's prior computations of the amount due him, Glenn conducted an

independent investigation to determine whether there were additional relatives of Joseph

Livingston who might have claims.

73. As a result of his independent investigation, Glenn referred the following persons

(the "Glenn Livingston Plaintiffs") to F&P and signed them up as F&P clients in the Peterson Liability Action:

> Joseph's sister Tia Fox
> the Estate of Joseph's father, Joseph Livingston Jr.

74.   Between 2002 and in or about November, 2005, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Livingston Plaintiffs.

75.   Glenn continued to work on the Livingston Plaintiffs case after completion of the Sommerhof and Helms cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

76.   On or about November 5, 2005, the Special Master issued her report and recommendation concerning the damages to be awarded to the Livingston Plaintiffs.

77.   Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with a computation of the fees that would be due under the Work Agreement and the Legal Referral Fees for the Glenn Livingston Plaintiffs if the Peterson Plaintiffs collected their judgment.

78.   F&P never objected to Glenn's work on behalf of the Livingston Plaintiffs.

79.   F&P never objected to Glenn's computation of the fees that would be due him.

80.   The Livingston Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of Joseph R. Livingston | $1,762,193.00 |
| Widow Annette Livingston | $8,000,000.00 |
| Son Joseph Livingston IV | $5,000,000.00 |
| Estate of father Joseph R. Livingston | $5,000,000.00 |
| Sister Tia Fox | $2,500,000.00 |
| TOTAL: | $22,262,193.00 |

81.   If the entire award is collected, Glenn's 3% share of the award to the Livingston

Plaintiffs would be $667,865.79.

82. If the entire award is collected, Glenn's Legal Referral Fees for the Glenn Livingston

Plaintiffs would be an additional $833,333.33.

83. If the entire award is collected, Glenn's total contingency fee for the Livingston

Plaintiffs would be $1,501,199.12.

**The Scott Plaintiffs**

84. On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to

F&P the claims of the following persons (collectively, the "F&P Scott Plaintiffs")

    the Estate of Gary Randall Scott, a Marine who was killed in the Beirut Bombing
    Gary's mother Mary Ann Scott
    Gary's brothers Stephen Scott
    Gary's brother Jon Scott
    Gary's brother Kevin Scott
    Gary's sister Susan Jordan Scott

85. In or about 2002, F&P retained Glenn to represent the F&P Scott Plaintiffs.

86. In reliance on Fay's and F&P's representations that he would receive Legal Referral

Fees, Glenn conducted an independent investigation and determined that F&P had failed to join

the estate of Gary's deceased father, Larry Scott.

87. Due to Glenn's efforts, the estate of Larry Scott signed up to be represented by F&P

in the Peterson Liability Action.

88. Between 2002 and in or about May, 2006, Glenn presented damages evidence to

Special Master Lorraine Ray on behalf of the Scott Plaintiffs.

89. Glenn continued to work on the Scott Plaintiffs case after completion of the

Sommerhof, Helms and Livingston cases in reliance upon F&P's tacit acceptance of his

computation of the fees that would be due him in those cases.

90. On or about May 20, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Scott Plaintiffs.

91. Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P, together with his computation of the fees that would be due under the Work Agreement and the Legal Referral Fee that would be due for the estate of Larry Scott if the Peterson Plaintiffs collected on their judgment.

92. F&P never objected to Glenn's work on behalf of the Scott Plaintiffs.

93. F&P never objected to Glenn's computation of the fees that would be due him.

94. The Scott Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of Gary Randall Scott | $    432,024.00 |
| Mother Mary Ann Scott | $5,000,000.00 |
| Estate of Father Larry L. Scott | $5,000,000.00 |
| Brother Stephen Scott | $2,500,000.00 |
| Brother Jon Christopher Scott | $2,500,000.00 |
| Brother Kevin James Scott | $2,500,000.00 |
| Sister Susan Jordan Scott | $2,500,000.00 |
| TOTAL | $20,432,024.00 |

95. If the entire award is collected, Glenn's 3% share of the award to the Scott Plaintiffs would be $612,960.72.

96. If the entire award is collected, Legal Referral Fee for the Estate of Larry L. Scott would be an additional $555,555.55.

97. If the entire award is collected, Glenn's total contingency fee for the Scott Plaintiffs would be $1,168,516.27.

**The Belmer Plaintiffs**

98. On information and belief, in or about 2001, Rothenberg and/or Defendant LaSpada referred to F&P the claims of the following persons ("F&P Belmer Plaintiffs"):

the estate of Alvin Belmer, who was killed in the Beirut Bombing
Alvin's mother Luddie Belmer;
Alvin's father Alue Belmer;
Alvin's brother Clarance Belmer
Alvin's brother Kenneth Belmer
Alvin's sister Annette Belmer
Alvin's sister Donna Belmer
Alvin's sister Denise Belmer

99. In or about 2002, F&P retained Glenn to prove damages on behalf of the F&P

Belmer Plaintiffs.

100. In reliance on Fay's and F&P's promise to pay Legal Referral Fees, Glenn

conducted an independent investigation to determine whether additional relatives of Alvin

Belmer could be joined as plaintiffs in the Peterson Liability Action.

101. As a result of his investigation, Glenn referred the following persons (the "Glenn

Belmer Plaintiffs") to F&P and signed them up as clients of F&P:

Alvin Belmer's widow Faye Belmer,
Alvin Belmer's son Colby Belmer

102. Between 2002 and in or about June, 2006, Glenn presented damages evidence to

Special Master Lorraine Ray on behalf of the Belmer Plaintiffs.

103. Glenn continued to work on the Scott Plaintiffs case after completion of the

Sommerhof and Helms cases in reliance upon F&P's tacit acceptance of his computation of the

fees that would be due him in those cases.

104. On or about June 2, 2006, the Special Master issued her report and recommendation

concerning the damages to be awarded to the Belmer Plaintiffs.

105. Immediately after receiving the Special Master's report, Glenn forwarded this report

to F&P, together with a computation what his 3% contingency fee his Legal Referral Fees for the

Glenn Belmer Plaintiffs would be if the Peterson Plaintiffs collected their judgment.

106. Defendants never objected to Glenn's work on behalf of the Belmer Plaintiffs.

107. Defendants never objected to Glenn's computation of the fees due him for the

Belmer Plaintiffs.

108. The Belmer Plaintiffs were issued the following awards:

| | |
|---|---|
| Alvin Belmer | $8,384,746.00 |
| Widow Faye A. Belmer | $8,000,000.00 |
| Son Keith A. Belmer | $5,000,000.00 |
| Mother Luddie Belmer | $5,000,000.00 |
| Father Alue Belmer | $5,000,000.00 |
| Brother Clarence Belmer | $2,500.000.00 |
| Brother Kenneth Belmer | $2,500.000.00 |
| Sister Annette Belmer | $2,500,000.00 |
| Sister Donna Belmer | $2,500,000.00 |
| Sister Denise Belmer | $2,500,000.00 |
| TOTAL: | $43,884,746.00 |

109. If the entire award is collected, Glenn's 3% share of the award to the Belmer

Plaintiffs would be $1,316,542.38.

110. If the entire award is collected, Glenn's Legal Referral Fees for the Glenn Belmer

Plaintiffs would be an additional $1,444.444.44.

111. If the entire award is collected, Glenn's total contingency fee for the Belmer

Plaintiffs would be $2,760,986.82.

**The Sturghill Plaintiffs**

112. On information and belief, in or about 2001, Defendant Rothenberg and/or LaSpada

referred to F&P the claims of the following persons (collectively the "Sturghill Plaintiffs"):

The Estate of Eric Sturghill, a Marine who was killed in the Beirut Bombing
Eric's father Marcus L. Sturghill
Eric's brother Marcus D. Sturghill
Eric's sister NeKeisha Sturghill

113. In or about 2002, F&P retained Glenn to represent the Sturghill Plaintiffs.

114. Between 2002 and in or about June, 2006, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Sturghill Plaintiffs.

115. Glenn continued to work on the Livingston Plaintiffs case after completion of the earlier cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

116. On or about June 2, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Sturghill Plaintiffs.

117. Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P, together with a computation of the fees which would be due for the Sturghill Plaintiffs pursuant to the Work Agreement if the Peterson Plaintiffs collected their judgment.

118. F&P never objected to Glenn's work on behalf of the Sturghill Plaintiffs.

119. F&P never objected to Glenn's computation of the fees that would be due him for the Sturghill Plaintiffs.

120. The Sturghill Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of Eric D. Sturghill | $ 725,378.00 |
| Father Marcus L. Sturghill | $5,000,000.00 |
| Brother Marcus D. Sturghill | $2,500,000.00 |
| Sister NeKeisha Lynn Sturghill | $2,500,000.00 |
| TOTAL | $10,725,378.00 |

121. If the entire award is collected, Glenn's 3% share of the award to the Sturghill Plaintiffs would be $321,761.34.

**The Woollett Plaintiffs**

122. On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to

F&P the claims of the following persons (the "Woollett Plaintiffs"):

> The Estate of Donald Woollett, a Marine who was killed in the Beirut Bombing
> Donald's mother Beverly Woollett
> Donald's father Paul Woollett
> Donald's sister Lillia Abbey
> Donald's sister Lyda Guz

123. In or about 2002, F&P retained Glenn to represent the Woollett Plaintiffs.

124. Between 2002 and in or about June, 2006, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Woollett Plaintiffs.

125. Glenn continued to work on the Woollett Plaintiffs case after completion of the earlier cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

126. On or about June 18, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Woollett Plaintiffs.

127. Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with his computation of the fees due under the Work Agreement if the Peterson Plaintiffs collected their judgment.

128. F&P never objected to Glenn's work on behalf of the Woollett Plaintiffs.

129. F&P never objected to Glenn's computation of the fees that would be due him for the Woollett Plaintiffs.

130. The Woollett Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of Donald Elberan Woollett | $2,021,565.00 |
| Father Paul R. Woollett | $5,000,000.00 |
| Mother Beverly Woollett | $5,000,000.00 |
| Sister Abbey Lima Woollett | $2,500,000.00 |
| Sister Lyda Guz | $2,500,000.00 |
| TOTAL: | $17,021,565.00 |

131. If the entire award is collected, Glenn's 3% share of the award to the Woollett Plaintiffs would be $510,646.95

**The Phillips Plaintiffs**

132. On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to F&P the claims of the following persons (the "F&P Phillips Plaintiffs")

> the Estate of John L. Phillips, Jr., a Marine who was killed in the Beirut Bombing
> John's mother Nancy Brocksbank Fox

133. In or about 2002, F&P retained Glenn to represent the F&P Phillips Plaintiffs.

134. In reliance on F&P's promise to pay Legal Referral Fees, Glenn conducted an independent investigation to determine whether other relatives of John L. Phillips should be joined in the Peterson Liability Action.

135. As a result of his investigation, Glenn referred the following additional persons (the "Glenn Phillips Plaintiffs") to F&P and signed them up as F&P clients:

> The Estate of John's father John L. Phillips, Sr.
> John's sister Victoria Jacobus
> John's sister Elizabeth Moy
> John's brother Harold I. Phillips

136. Between 2002 and in or about August, 2006, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Phillips Plaintiffs.

137. Glenn continued to work on the Phillips Plaintiffs case after completion of the earlier cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

138. On or about August 3, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Phillips Plaintiffs.

139. Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with a computation of the fees that would be due under the Work Agreement and the Legal Referral Fees that would be due for the Glenn Phillips Plaintiffs if the Peterson Plaintiffs collected on their judgment.

140. F&P never objected to Glenn's work on behalf of the Phillips Plaintiffs.

141. F&P never objected to Glenn's computation of the fees that would be due him.

142. The Phillips Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of John Phillips, Jr. | $1,030,308.00 |
| Mother Nancy Brocksbank Fox | $5,000,000.00 |
| Estate of Father John Arthur Phillips, Sr. | $5,000,000.00 |
| Sister Victoria Jacobus | $2,500,000.00 |
| Brother Harold T. Phillips | $2,500,000.00 |
| Sister Elizabeth P. Moy | $2,500,000.00 |
| TOTAL | $18,530,308.00 |

143. If the entire award is collected, Glenn's 3% share of the award to the Phillips Plaintiffs would be $555,909.24.

144. If the entire award is collected, Glenn's Legal Referral Fees for the Glenn Phillips Plaintiffs would be an additional $1,388,888.88.

145. If the entire award is collected, Glenn's total contingency fee for the Phillips Plaintiffs would be $1,944,798.12.

**The Young Plaintiffs**

146. On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to F&P the claim of the estate of Thomas D. Young, a Marine who survived the Beirut Bombing.

147. In or about 2002, F&P retained Glenn to represent Thomas D. Young.

148. In reliance on Fay's and F&P's promise to pay Legal Referral Fees, Glenn

conducted an independent investigation to determine whether other relatives of Thomas D.

Young should be joined as plaintiffs in the Peterson Liability Action.

149. As a result of his investigation, Glen referred the following additional persons (the

"Glenn Young Plaintiffs") to F&P and signed them up as F&P clients:

> The Estate of Thomas's late father Robert J. Young
> The Estate of Thomas's late mother Nora Young
> Thomas's brother James P. Young
> Thomas's sister Mary E. Young

150. Between 2002 and in or about August, 2006, Glenn presented damages evidence to

Special Master Lorraine Ray on behalf of the Young Plaintiffs.

151. Glenn continued to work on the Young Plaintiffs case after completion of the earlier

cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due

him in those cases.

152. On or about August 11, 2006, the Special Master issued her report and

recommendation concerning the damages to be awarded to the Young Plaintiffs.

153. Immediately after receiving the Special Master's report, Glenn forwarded this report

to F&P, together with his computation of the fees that would be due under the Work Agreement

for the Young Plaintiffs, and the Legal Referral Fees that would be due for the Glenn Young

Plaintiffs, if the Peterson Plaintiffs collected their judgment.

154. F&P never objected to Glenn's work on behalf of the Young Plaintiffs.

155. F&P never objected to Glenn's computation of the fees that would be due him for

the Young Plaintiffs.

156. The Young Plaintiffs were awarded the following damages:

Thomas D. Young                                   $1,500,000.00

| Estate of Father Robert J. Young | $2,500,000.00 |
| Estate of Mother Nora Young | $2,500,000.00 |
| Brother James P. Young | $1,250,000.00 |
| <u>Sister Mary E. Stilpen</u> | <u>$1,250.000.00</u> |
| TOTAL | $9,000,000.00 |

157. If the entire award is collected, Glenn's 3% share of the award to the Young Plaintiffs would be $270,000.00.

158. If the entire award is collected, Glenn's Legal Referral Fees for the Glenn Young Plaintiffs would be an additional $833,333.33.

159. If the entire award is collected, Glenn's total contingency fee for the Young Plaintiffs would be $1,103,333.33.

**The Swinson Plaintiffs**

160. On information and belief, in or about 2001, Defendant Rothenberg and/or LaSpada referred to F&P the claims of Craig Swinson, a Marine who survived the Beirut Bombing.

161. In or about 2002, F&P retained Glenn to represent Craig Swinson.

162. In reliance on Fay's and F&P's representation that they would pay Legal Referral Fees, Glenn conducted an independent investigation to determine whether relatives of Craig Swinson should be joined as plaintiffs in the Peterson Liability Action.

163. Based on his investigation, Glenn referred the following additional persons (the "Glenn Swinson Plaintiffs") to F&P and signed them up as F&P clients:

Craig's sister Dawn Swinson
Craig's sister Teresa Swinson
Craig's sister Cydia Shaver
Craig's brother William Swinson
Craig's brother Daniel Swinson
The Estate of Craig's father Kenneth Swinson
The Estate of Craig's mother Ingrid Swinson

164. Between 2002 and in or about August, 2006, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Swinson Plaintiffs.

165. Glenn continued to work on the Swinson Plaintiffs case after completion of the earlier cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

166. On or about August 25, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Swinson Plaintiffs.

167. Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with his computation of the fees that would be due under the Work Agreement and the Legal Referral Fees that would be due for the Glenn Swinson Plaintiffs if the Peterson Plaintiffs collected their judgment.

168. F&P never objected to Glenn's work on behalf of the Swinson Plaintiffs.

169. F&P never objected to Glenn's computation of the fees that would be due him for the Swinson Plaintiffs.

170. The Swinson Plaintifffs were awarded the following damages:

| | |
|---|---|
| Greg Swinson | $1,500,000.00 |
| Estate of Father Keneth J. Swinson | $2,500,000.00 |
| Estate of Mother Ingrid Swinson | $2,500,000.00 |
| Sister Cydia Shaver | $1,250,000.00 |
| Sister Dawn Swinson | $1,250,000.00 |
| Sister Teresa Swinson | $1,250,000.00 |
| Brother William Swinson | $1,250,000.00 |
| Brother Daniel Swinson | $1,250,000.00 |
| TOTAL: | $12,750,000.00 |

171. If the entire award is collected, Glenn's 3% share of the award to the Swinson Plaintiffs would be $382,500.00.

172. If the entire award is collected, Glenn's Legal Referral Fees for the Glenn Swinson Plaintiffs would be an additional $1,250,000.00.

173. If the entire award is collected, Glenn's total contingency fee for the Swinson Plaintiffs would be $1,632,500.00.

**The Moore Plaintiffs**

174. On information and belief, in or about 2001, Rothenberg and/or LaSpada referred to F&P the claims of the following persons (the "F&P Moore Plaintiffs"):

Lovelle Moore, a Marine who survived the Beirut Bombing
Lovelle's mother Ame Mae Moore

175. In or about 2002, F&P retained Glenn to represent the F&P Moore Plaintiffs.

176. In reliance on F&P's promise to pay Legal Referral Fees, Glenn did an independent investigation to determine whether other relatives of Lovelle Moore should be joined to the Peterson Liability Action.

177. As a result of his investigation, Glenn referred the following persons (the "Glenn Moore Plaintiffs") to F&P and signed them up as F&P clients in the Peterson Liability Action:

Lovelle's sister Deborah Crawford
Lovelle's sister Audrey Webb
Lovelle's sister Alice Warren Franklin
Lovelle's sister Jonnie Mae Moore-Jones
Lovelle's brother Marvin Moore
Lovelle's brother Jamaal Ali
The Estate of Lovelle's father Johnney Moore
The Estate of Lovelle's brother Bronzem Warren
The Estate of Lovelle's brother James Ottis Moore

178. Between 2002 and in or about August, 2006, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Moore Plaintiffs.

179. Glenn continued to work on the Moore Plaintiffs case after completion of the earlier

cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

180. On or about August 29, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Moore Plaintiffs.

181. Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with a computation of the fees that would be due under the Work Agreement and the Legal Referral Fees that would be due for the Glenn Moore Plaintiffs if the Peterson Plaintiffs collected their judgment.

182. Defendants never objected to Glenn's work on behalf of the Moore Plaintiffs.

183. Defendants never objected to Glenn's computation of the fees he had earned.

184. The Moore Plaintiffs were awarded the following damages:

| | |
|---|---|
| Survivor Lovelle Moore | $8,314,513.00 |
| Mother Allie Mae Moore | $2,500,000.00 |
| Estate of Father Johnney Moore | $2,500,000.00 |
| Sister Deborah Crawford | $1,250,000.00 |
| Sister Audrey Webb | $1,250,000.00 |
| Sister Alice Warren Franklin | $1,250,000.00 |
| Sister Johnnie Mae Moore-Jones | $1,250,000.00 |
| Estate of Brother Bronzell Warren | $1,250,000.00 |
| Brother Marvin S. Moore | $1,250,000.00 |
| Estate of Brother James Ottis Moore | $1,250,000.00 |
| Brother Jamaal Ali | $1,250,000.00 |
| TOTAL | $23,314,513.00 |

185. If the entire award is collected, Glenn's 3% share of the award to the Moore Plaintiffs would be $699,435.39.

186. If the entire award is collected, Glenn's 11.11% share of the total award to the Glenn Moore Plaintiffs would be an additional $1,388,888.88.

187. If the entire award is collected, Glenn's total contingency fee for the Moore

Plaintiffs would be $2,088,324.27.

## The Wheeler Plaintiffs

188. On information and belief, in or about 2001, Rothenberg and or LaSpada referred to

F&P the claims of the following persons (referred to herein as the "Wheeler Plaintiffs"):

> Danny Wheeler, a Marine who survived the Beirut Bombing
> Danny's wife Brenda Jane Wheeler
> Danny's son Andrew Wheeler
> Danny's son Jonathan Wheeler
> Danny's son Benjamin Wheeler
> Danny's sister Kerry Wheeler
> Danny's mother Molly Wheeler
> Danny's sister Jill Wold

189. In or about 2002, F&P retained Glenn to represent the F&P Wheeler Plaintiffs.

190. Between 2002 and in or about August, 2006, Glenn presented damages evidence to

Special Master Lorraine Ray on behalf of the Wheeler Plaintiffs.

191. Glenn continued to work on the Wheeler Plaintiffs case after completion of the

earlier cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be

due him in those cases.

192. On or about August 29, 2006, the Special Master issued her report and

recommendation concerning the damages to be awarded to the Wheeler Plaintiffs.

193. Immediately after receiving the Special Master's report, Glenn forwarded this report

to F&P, together with his computation of the fees that would be due pursuant to the Work

Agreement if the Peterson Plaintiffs collected on their judgment.

194. Defendants never objected to Glenn's work on behalf of the Wheeler Plaintiffs.

195. F&P never objected to Glenn's computation of the fees that would be due for the

Wheeler Plaintiffs.

196. The Wheeler Plaintiffs were awarded the following damages:

| | |
|---|---|
| Danny Wheeler | $5,000,000.00 |
| Wife Jane Wheeler | $4,000,000.00 |
| Son Andrew Wheeler | $4,000,000.00 |
| Son Jonathan Wheeler | $4,000,000.00 |
| Son Benjamin Wheeler | $4,000,000.00 |
| Sister Kerry Wheeler | $1,250,000.00 |
| Sister Jill Wold | $1,250,000.00 |
| Estate of Mother Molly Wheeler | $2,500,000.00 |
| TOTAL | $21,500,000.00 |

197.    If the entire award is collected, Glenn's 3% share of the award to the Wheeler

Plaintiffs would be $645,000.00.

**The Thorstad Plaintiffs**

198.    On information and belief, in or about 2001, Defendant Rothenberg and/or

LaSpada referred to F&P the claims of the following persons (the "F&P Thorstad Plaintiffs"):

The Estate of Thomas Thorstad, a Marine who was killed in the Beirut Bombing
Thomas's father James Thorstad, Sr.,
Thomas's mother Barbara Thorstad,
Thomas's sister Susan Hugis

199.    In reliance on Fay's and F&P's representation that F&P would pay Legal Referral

Fees, Glenn conducted an independent investigation to determine whether other relatives of

Thomas Thorstad should be joined as Peterson Plaintiffs.

200.    Based on his investigation, Glenn referred the following additional persons (the

"Glenn Thorstad Plaintiffs") to F&P and signed them up as F&P clients:

Thomas's widow Kathleen Hedge
Thomas's son Ryan Thorstad
Thomas's son Adam Thorstad
Thomas's sister Janice Thorstad
Thomas's sister Katheryn Thorstad
Thomas's sister Barbara Thorstad
Thomas's sister Patricia Thorstad Zosso

Thomas's brother James Thorstad Jr.
Thomas's brother John Thorstad

201.    Between 2002 and in or about September, 2006, Glenn presented damages evidence to Special Master Lorraine Ray on behalf of the Thorstad Plaintiffs.

202.    Glenn continued to work on the Thorstad Plaintiffs case after completion of the earlier cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

203.    In or about September 11, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Thorstad Plaintiffs.

204.    Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with his computation of the fees that would be due under the Work Agreement and the Legal Referral Fees that would be due for the Glenn Thorstad Plaintiffs, if the Peterson Plaintiffs collected their judgment.

205.    Defendants never objected to Glenn's work on behalf of the Thorstad Plaintiffs.

206.    Defendants never objected to Glenn's computation of the fees that would be due him for the Thorstad Plaintiffs.

207.    The Thorstad Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of Thomas Paul Thorstad | $1,921,086.00 |
| Widow Kathleen Hedge | $8,000,000.00 |
| Son Adam Thorstad | $5,000,000.00 |
| Son Ryan Thorstad | $5,000,000.00 |
| Father James Thorstad Sr. | $5,000,000.00 |
| Mother Barbara G. Thorstad | $5,000,000.00 |
| Estate of Sister Susan Hugis | $2,500,000.00 |
| Sister Janice Thorstad | $2,500,000.00 |
| Brother James Thorstad | $2,500,000.00 |
| Sister Katrhyn Thorstad | $2,500,000.00 |
| Sister Barbara Thorstad | $2,500,000.00 |

| | |
|---|---|
| Sister Patricia Thorstad Zosso | $2,500,000.00 |
| Brother John Thorstad | $2,500,000.00 |
| TOTAL | $49,921,086.00 |

208.    If the entire award is collected, Glenn's 3% share of the award to the Thorstad

Plaintiffs would be $1,497,632.58.

209.    If the entire award is collected, Glenn's Legal Referral Fees for the Glenn

Thorstad Plaintiffs would be an additional $3,666,666.66.

210.    If the entire award is collected, Glenn's total contingency fee for the Thorstad

Plaintiffs would be $5,164,299.24.

### The Olson Plaintiffs

211.    On information and belief, in or about 2001, Rothenberg and/or LaSpada referred

to F&P the claims of the following persons (the "F&P Olson Plaintiffs"):

The estate of John L. Olson, a Marine who was killed in the Beirut Bombing
John's sister Julia McFarlin
John's sister Mary Baumgartner
John's sister Susan Sinsicoco;
Jon's sister Karen Olson
Jon's sister Jan Christian;
John's sister Wendy Lange
John's brother Ronald Olson
John's brother Roger Olson
John's brother Randal Olson

212.    In or about 2002, F&P retained Glenn to represent the F&P Olson Plaintiffs.

213.    In reliance on F&P's promise to pay Legal Referral Fees, Glenn independently

investigated whether other relatives of Jon Olson should be joined as plaintiffs in the action.

214.    As a result of his investigation, Glenn referred the following additional persons

(the "Glenn Olson Plaintiffs") to F&P and signed them up as F&P clients:

The Estate of John's father Sigurd Olson

The Estate of John's mother Bertha Olson

215.    Between 2002 and in or about September 2006, Glenn presented the damages evidence to Special Master Lorraine Ray on behalf of the Olson Plaintiffs.

216.    Glenn continued to work on the Olson Plaintiffs case after completion of the earlier cases in reliance upon F&P's tacit acceptance of his computation of the fees that would be due him in those cases.

217.    On or about September 12, 2006, the Special Master issued her report and recommendation concerning the damages to be awarded to the Olson Plaintiffs.

218.    Immediately after receiving the Special Master's report, Glenn forwarded this report to F&P together with a computation of the fees that would be due under the Work Agreement and the Legal Referral Fees that would be due for the Glenn Olson Plaintiffs if the Peterson Plaintiffs collected their judgment.

219.    F&P never objected to Glenn's work on behalf of the Olson Plaintiffs.

220.    F&P never objected to Glenn's computation of the fees that would be due him for the Olson Plaintiffs.

221.    The Olson Plaintiffs were awarded the following damages:

| | |
|---|---|
| Estate of John L. Olson | $1,010,497.00 |
| Estate of Father Sigurd Olson | $5,000,000.00 |
| Estate of Mother Bertha Olson | $5,000,000.00 |
| Sister Julia A. McFarlin | $2,500,000.00 |
| Brother Ronald J. Olson | $2,500,000.00 |
| Sister Jana M. Christian | $2,500,000.00 |
| Brother Roger S. Olson | $2,500,000.00 |
| Sister Mary E. Baumgartner | $2,500,000.00 |
| Brother Randal D. Olson | $2,500,000.00 |
| Sister Susan J. Sinsioco | $2,500,000.00 |
| Sister Karen L. Olson | $2,500,000.00 |
| Sister Wendy L. Lange | $2,500,000.00 |

TOTAL                                        $33,510,597.00

222.     If the entire award is collected, Glenn's 3% share of the award to the Olson

Plaintiffs would be $1,005,314.91.

223.     If the entire award is collected, Glenn's 11.11% share of the total award to the

Glenn Olson Plaintiffs would be an additional $1,111,111.11.

224.     If the entire award is collected, Glenn's total contingency fee for the Olson

Plaintiffs would be $2,116,426.02.

## THE SUBSEQUENT PETERSON COLLECTION ACTIONS

225.     On information and belief, at least two Peterson Collection Actions are now

pending in the Southern District of New York, and the Peterson Plaintiffs have been joined as

necessary parties in a third proceeding in this District.

226.     On information and belief, the Peterson Collection Actions sought to satisfy the

judgment in the Peterson Action from Iran's secret bank accounts in the Southern District of

New York, including Citibank N.A. and Clearstream Bank S.A.

227.     On information and belief, as a result of the Peterson Collection Actions, more

than Two Billion Dollars ($2,000,000,000.00) in assets located in New York but belonging to

Iran have been frozen to pay damages to the Peterson Action plaintiffs, and to pay attorneys' fees

for the attorneys in the Peterson Action.

228.     On information and belief, the Defendants have a charging lien on any recovery in

New York which lien will likely result in Defendants' recovery of several hundred million

dollars in legal fees for their representation of Peterson Plaintiffs.

## DEFENDANTS' DISPUTE OF GLENN'S CHARGING LIEN

229.    In or about March, 2010, Fay and F&P told Glenn that they do not recognize his charging lien in the Peterson Liability Action.

230.    In or about March, 2010, Fay and F&P told Glenn that they would not pay the Legal Referral Fees which he earned by locating and referring new Peterson Plaintiffs.

231.    In or about March, 2010, Fay and F&P told Glenn that he is not entitled to 3% of all damages recovered on behalf of the Peterson Plaintiffs that he represented in damages hearings before the Special Master.

232.    If the entire judgment is recovered, Glenn's claim against the New York Iranian Assets for his legal services would be 3% of $309,741,881.00 or $9,292,256.43.

233.    If the entire judgment is recovered, Glenn's Legal Referral Fees for the Forty (40) Peterson Plaintiffs that Glenn referred to F&P would be 1/3 x 1/3 x $111,750,000.00 or $12,416,666.66, plus interest.

234.    Glenn is also entitled to $15,288.56 for reimbursement of out of pocket expenses that he paid in connection with his representation of the Peterson Plaintiffs.

235.    As a result of the foregoing there is a justiciable controversy over the existence and amount of Glenn's claim against the New York Iranian Assets.

## COUNT 1

236.    Plaintiff repeats and realleges each allegation set forth in paragraphs 1 through 235 as though set forth more fully herein.

237.    By virtue of the foregoing, Glenn is entitled to a declaratory judgment affirming that he has a claim against the New York Iranian Assets in an amount equal to 3% of any

recovery by the 103 Peterson Plaintiffs who F&P referred to him for proof of damages, and

11.1111% of any recovery for the Forty (40) Plaintiffs that he referred to F&P.

238.    By virtue of the foregoing, Glenn has a charging lien against the New York

Assets if and when a final turnover order issues directing that those assets be paid to the Peterson

Plaintiffs.

## COUNT 2

239.    Plaintiff repeats and realleges each allegation set forth in paragraphs 1 through

238 as though set forth more fully herein.

240.    On information and belief, defendants Rothenberg and LaSpada claim to have

referred all of the following plaintiffs to F&P (the "Glenn Plaintiffs"):

| | | |
|---|---|---|
| Estate of John Phillips, Sr. | Victoria Jacobus | Harold Phillips |
| Elizabeth P. Moy | Estate of Larry L. Scott | Estate of Kenneth J. Swinson |
| Estate of Ingrid Swinson | Cydia Shaver | Kathleen Hedge |
| Adam Thorstad | Ryan Thorstad | Janice Thorstad |
| James Thorstad Jr. | Kathryn Thorstad | Barbara Thorstad |
| Patricia Thorstad Zosso | John Thorstad | Estate of Robert J. Young |
| Estate of Nora Young | James P. Young | Mary E. Stilpen |
| Dawn Swinson | Teresa Swinson | William Swinson |
| Daniel Swinson | Estate of Sigurd Olson | Estate of Ingrid Olson |
| Estate of Johnney Moore | Jamaal Ali | Deborah Crawford |
| Audrey Webb | Alice Warren Franklin | Estate of Bronzell Warren |
| Marvin Moore | Estate of James Moore | Johnnie Mae Moore-Jones |
| Tia Fox | Estate Joseph R. Livingston | Faye Belmer |
| Colby Belmer | | |

241.    In fact, Glenn referred each of the Glenn Plaintiffs to F&P.

242.    By virtue of the foregoing, Glenn is entitled to a determination that he is the

referring attorney for the claims of each of the Glenn Plaintiffs.

## COUNT 3

243.    Plaintiff repeats and realleges each allegation set forth in paragraphs 1 through 242 as though set forth more fully herein.

244.    On information and belief, as a result of the Peterson Collection Actions, funds located in New York have been identified and frozen.

245.    On information and belief, Defendants and their agents are prosecuting a turnover proceeding in the Southern District of New York, to obtain the frozen Iranian assets and to use them to satisfy the judgment in the Peterson Liability Action.

246.    On information and belief, the turnover proceedings in New York are sealed and are not available for review on the Court's PACER system.

247.    On information and belief, F&P maintains a proprietary website, which it uses to keep the Peterson Plaintiffs informed as to developments in the NY Turnover Proceedings.

248.    Glenn is not allowed access to the website.

249.    Glenn has already signed all protective orders necessary to obtain access to sealed documents in the Peterson Liability Action.

250.    Glenn and his attorneys will sign any additional protective orders and/or other agreements and/or documents necessary to obtain access to sealed documents in the Peterson Collection Actions.

251.    Glenn's attorneys are also willing to sign any documents necessary to obtain access to sealed documents in the Peterson Collection Actions.

252.    Glenn is also entitled to copies of all pleadings and proceedings in the turnover proceedings, so that he can protect his interest in those turnover proceedings.

**WHEREFORE,** Plaintiff prays that the Court enter a judgment:

a)       Declaring that Plaintiff has a valid and enforceable charging lien against any recovery of the New York Assets in the Peterson Collection Actions equal to 3% of any recovery for the 103 Peterson Plaintiffs for whom Glenn proved damages, plus Legal Referral Fees equal to 11.1111% of any recovery for the Forty (40) Glenn Plaintiffs who were referred to Defendants by Glenn.

b)       Declaring that Glenn is the referring attorney for each of the Glenn Plaintiffs.

c)       Directing that Plaintiff and his counsel be permitted access to the sealed files in the Peterson Collection Actions so that Plaintiff may protect his charging lien; and

d)       Awarding to Glenn such other relief as the Court deems just and proper.

Dated: New York, New York
       March    , 2011

                                        _____
                                        Daniel Cobrinik (DC 6406)
                                              Attorney for Plaintiff
                                        276 Fifth Avenue – Suite 405
                                        New York, New York 10001
                                        (212) 725-6888

33